**IN THE CIRCUIT COURT OF THE TWENTIETH JUDICIAL CIRCUIT
IN AND FOR LEE COUNTY, FLORIDA
CIVIL DIVISION**

PrivateSky Aviation Realty LLC,

     Plaintiff,                            Case No.:

v.

Lee County Port Authority,

     Defendant.

_____/

## COMPLAINT

Plaintiff PrivateSky Aviation Realty LLC ("Private Sky") files this Complaint against Lee County Port Authority (the "Port Authority") asserting claims for breach of terms expressly incorporated into a contract, breach of the implied duty of good faith and fair dealing incorporated into a provision of a contract that provides the Port Authority with certain discretion, and for a declaration relating to two federal questions. In support, Private Sky alleges as follows.

1. The Port Authority leases airport property at Ft. Myers' Southwest Florida International Airport (RSW) to Private Sky, a fixed-base operator (FBO).

2. Section 21.10 of Private Sky's Lease gives the Port Authority discretion to lease other airport property to a competing FBO. This discretion is not unfettered. As with nearly all discretionary contractual rights, Florida law requires the Port Authority to exercise its discretion in section 21.10 in compliance with a duty of good faith and fair dealing.

3.　　A separate provision of the Lease, section 22.3, incorporates obligations the Port Authority owes to the Federal Aviation Administration ("FAA") pursuant to Federal statute, including Grant Assurances for Airport Sponsors (the "FAA Grant Assurances"). One of these incorporated terms is a requirement that the Port Authority only lease to other FBOs on economically non-discriminatory terms. In other words, the Lease prevents the Port Authority from favoring another FBO over Private Sky by giving the other FBO better lease terms.

4.　　As detailed below, the Port Authority has exercised its discretion in section 21.10 of the Lease in bad faith by using the discretion for the purpose of destroying Private Sky's business after Private Sky invested tens of millions of dollars into the Port Authority's property, which will cause Private Sky to breach the Lease's requirement to operate an FBO on the property and prevent Private Sky from enjoying the fruits of the Lease and the substantial investment required by the Lease. The Port Authority's conduct breaches the implied duty of good faith and fair dealing in section 21.10 of the Lease.

5.　　The Port Authority has also breached the economic-nondiscrimination obligation in section 22.3 of the Lease, which is incorporated from the statutory FAA Grant Assurances as an express term of the Lease. The Port Authority has signed a lease with Private Sky's competitor, Signature Aviation, that provides Signature with a substantially better long-term lease rate, a better lease term length that does not include a capital investment condition precedent, access to negotiations with the Port Authority for a lease of the parcel without paying an upfront negotiating fee, on-grade

horizontal improvements, the right to locate a fuel farm on the leased parcel, and the right to "land bank" (i.e., permitting Signature to take land off the market without being required to develop or use it), among other advantages over Private Sky.

6.      Private Sky initially sought relief for the Port Authority's wrongful conduct described in this Complaint in Florida state court. The Port Authority sought and obtained dismissal of that case on the grounds that the state court lacked subject-matter jurisdiction. The Court agreed and dismissed all claims in the case on the grounds that it lacked jurisdiction to resolve federal questions concerning the FAA Grant Assurances incorporated as express terms of the Lease.

7.      The state court's ruling that it lacked subject-matter jurisdiction requires that Private Sky seek relief in this Court, which has subject-matter jurisdiction to resolve the federal question that the state court felt was dispositive of this action. No other venue is available to adjudicate Private Sky's breach of contract claims. While the Port Authority suggests the FAA is the best venue, the FAA does not have jurisdiction to adjudicate Private Sky's claims for damages and injunctive relief and there is no mechanism or procedure in the FAA complaint process to award Private Sky damages or injunctive relief for breach of contract.

## Parties, Jurisdiction, and Venue

8.      Private Sky is a Florida limited liability company authorized to conduct business in the State of Florida, with its principal place of business in Lee County, Florida.

9.      For more than twenty-four (24) years, Private Sky has served as the sole fixed-base operator ("FBO") at Southwest Florida International Airport ("RSW" or "RSW Airport") in Fort Myers, Lee County, Florida, where it has provided award-winning services to international and domestic aviation clients.

10.     Private Sky operates its FBO through its affiliate, PrivateSky Aviation Services, Inc.

11.     The Port Authority is a dependent special district of Lee County, Florida, maintains its headquarters in Lee County, Florida, and operates RSW Airport.

12.     This Court has subject-matter jurisdiction over Counts I and II of this Complaint under 28 U.S.C. § 1331 because the claims in those Counts arise under the Constitution or laws of the United States. *See Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg.*, 545 U.S. 308, 312, 125 S.Ct. 2363, 2366-67, 162 L.Ed.2d 257 (2005).

13.     This Court has subject-matter jurisdiction over Count III of this Complaint under 28 U.S.C. § 1331 because the claims in that count arise under the Constitution or laws of the United States. In the alternative, this Court has subject-matter jurisdiction over Count III of this complaint under 28 U.S.C. § 1367(a) because the claims set forth in Count III are so related to the claims in Counts I and II of this Complaint that they form part of the same case or controversy under Article III of the United States Constitution.

14. Venue is proper in this Court because the Port Authority resides within this District, and the operative facts and circumstances giving rise to this Complaint occurred within this District.

15. This Court has personal jurisdiction over the Port Authority because the Port Authority is located within this District. Specifically, the Port Authority has its principal place of business in this District, and engages in business in this District.

### The Port Authority

16. As the governmental entity that operates RSW, the Port Authority exercises substantial authority over airport property, leasing, and the procurement of goods and services at RSW.

17. The Port Authority is also Private Sky's lessor under a long-term ground lease first executed in 2000. Through that lease relationship, the Port Authority controls the property on which Private Sky's FBO operates and retains significant authority affecting Private Sky's continued operations at RSW.

18. Over the course of more than two decades, Private Sky has made substantial investments in its facilities, operations, and workforce at RSW in reliance on its leasehold rights and the Port Authority's role as landlord and airport operator.

19. As both lessor and regulator of airport operations, the Port Authority occupies a position of unique power with respect to Private Sky, including the ability to influence the competitive environment in which Private Sky operates.

20. At the same time, the Port Authority is responsible for the competitive procurement of goods and services at RSW and for issuing solicitations, evaluating

proposals, and awarding contracts and leases relating to airport property and operations.

21.    The Port Authority's power to control both leasing and procurement places it in a position to determine not only the terms under which existing operators such as Private Sky conduct business at RSW, but also whether, how, and under what conditions new competitors may be introduced at the airport. Because Private Sky is captured and cannot move its location, the Port Authority's ability to accept competitors at the airport places bet-the-company risk on Private Sky. If the Port Authority chooses to bring in a competitor on more favorable terms, the Port Authority can put Private Sky out of business and cause it to lose the millions of dollars in investments into horizontal and vertical improvements required by the Lease. For this reason, Private Sky relied on the economic non-discrimination provision incorporated into the Lease when deciding to invest in the Lease, including the tens of millions of dollars it has invested since the Lease's inception. Had the Port Authority not incorporated the economic non-discrimination provision into the Lease or informed Private Sky at any point of its position that the provision was not enforceable by Private Sky in court and thus illusory, Private Sky would not have agreed to the millions of dollars of investment commitments in the Lease and would not have made those investments.

### The Lease Between Private Sky and the Port Authority

22.    Private Sky leases its facilities from the Port Authority pursuant to a lease agreement that was first executed in 2000, consolidated and renewed in 2008 (effective October 1, 2007), and amended in 2018 (collectively, the "Lease").

23.    When Private Sky initially negotiated its Lease with the Port Authority, it requested a lease term of 50 years.

24.    In response, the Port Authority informed Private Sky that it would not permit an FBO to lease property at RSW for a term longer than 27 years with a 5-year renewal option, and that a 50-year lease was simply not possible.

25.    In 2018, Private Sky acquired options to extend the Lease by another ten years and twenty-eight years. To exercise the first option, Private Sky must invest an additional $2 million in improvements to the Port Authority's property before 2032. To exercise the second option, Private Sky must invest a total of $5.6 million in improvements to the Port Authority's property by 2032.

26.    Thus, to obtain a 50-year lease, Private Sky was required to build out its entire initial parcel, absorb the risk for 18 years that its maximum lease term would be 32 years, and invest an additional $3.6 million in improvements to the Port Authority's property.

27.    Private Sky has made at least $2,000,000 in such improvements to date in reliance on the 2018 Amendment to its Lease.

28.     Private Sky made, and continues to make, these investments in reliance on its leasehold rights and on the understanding that the Port Authority would not alter the economic terms of the option Private Sky purchased.

29.     The parties' relationship has been fruitful for many years and, under the Lease as amended, should persist through 2060.

30.     As Private Sky's governmental landlord, the Port Authority holds substantial power and discretion over airport property and operations at RSW. Private Sky relies on the Port Authority's duty of good faith and fair dealing in the Lease to ensure that the Port Authority does not induce Private Sky to invest millions of dollars into airport property and then exercise its authority in a manner that destroys or substantially undermines the value of Private Sky's investment, its business, and its leasehold rights.

31.     Several years ago, Private Sky asked the Port Authority to permit it to lease an additional parcel of airport property at a favorable location ("Parcel X").

32.     The Port Authority would not discuss a possible lease of Parcel X with Private Sky unless Private Sky paid a substantial upfront fee. The Port Authority did not put a lease of Parcel X up for bid, despite the interest expressed in the parcel by Private Sky.

### The Port Authority's Procurement for an Additional FBO at RSW

33.     In May 2024, the Port Authority initiated a competitive procurement by issuing Request for Proposal ("RFP") 25-0002MC seeking an additional FBO operator at RSW. The RFP sought bids for a lease of a parcel labeled Parcel A, which is different

from and does not include any of Parcel X. The Port Authority's request for proposals also permitted bidders to take any part of Parcel B they wished, also another entirely different parcel than Parcel X. There was no offer for Parcel X in the RFP. The RFP did not provide for the lease of any additional parcels or adjoining acreage, and did not permit prospective FBOs to seek to lease any other parcels.

34. The Port Authority precluded Private Sky from bidding on Parcels A and B. Private Sky did not want those parcels in any event.

35. The RFP expressly prohibited "[l]and banking, or similar attempts to restrict the future use or availability of the additional acreage, without an immediate need for the land for development."

36. Section A.06 of the RFP provided that interpretations, corrections, or changes made by the Port Authority to the RFP would be made by written addenda. Thus, changes to the fundamental terms of the RFP could be made only by published addendum, providing all potential bidders with the opportunity to submit proposals for the materially changed RFP.

37. Private Sky was concerned that the Port Authority had not conducted a feasibility analysis for the operation of two FBOs at RSW, since industry standards do not support two FBOs at an airport with fuel sales such as those at RSW.

38. When Private Sky brought these concerns to the Port Authority's attention, the Port Authority contended that the parties must comply with the Grant Assurances in the Lease and that those assurances required the Port Authority to seek

out interest from other FBOs and issue the RFP regardless of whether the fuel sales can support two FBOs.

39.   In November 2024, the Board of Port Commissioners chose Signature as the prevailing bidder, though Signature's bid did not meet the minimum requirements in the RFP.

40.   At that same time, Private Sky provided notice to the Port Authority that Signature had obtained competitively-sensitive information from Private Sky by promising that it would not attempt to compete with Private Sky at RSW and would use the information only to evaluate a possible acquisition of Private Sky pursuant to a written non-disclosure agreement.

41.   The Port Authority then began closed-door negotiations with Signature.

42.   Nearly a year later, in a notice of a meeting of the Airport Special Management Committee published online, the Port Authority attached a proposed lease with Signature *for Parcel X*, not Parcel A, on terms more favorable than those required by the RFP and that would give Signature benefits over Private Sky on certain "pain points" Signature learned from Private Sky pursuant to the non-disclsoure agreement.

43.   Parcel X was never made the subject of a competitive bidding process. Nor were the more favorable lease terms the Port Authority negotiated with Signature behind closed doors, including Signature's right to land bank, to avoid substantial investment on fill to make the land on-grade, and the longer lease length, among other things.

### The Port Authority's Facilitation of
### Signature's Informational Competitive Advantage

44.    The Port Authority has facilitated Signature's use of an unfair informational competitive advantage over Private Sky.

45.    The Port Authority agreed to Signature's proposal with notice that Signature had improperly obtained access to Private Sky's sensitive business information prior to submitting its proposal to the Port Authority.

46.    The Port Authority did not investigate whether it was permitting Signature to unfairly compete with Private Sky.

47.    After approving Signature's proposal, the Port Authority also helped conceal information of the same type that Signature had improperly obtained from Private Sky. Instead of requiring a fair and nondiscriminatory competitive playing field, the Port Authority allowed Signature to retain and use that unfair informational advantage over Private Sky.

### Signature's Lease and Advantages Conferred on Signature

48.    Ultimately, the Port Authority executed a lease with Signature (the "Signature Lease") that contains terms allowing Signature to pay significantly lower rates, fees, rentals, and other charges than those imposed on Private Sky under the Lease. The differences between the leases include the following terms.

| Signature Lease | Private Sky Lease |
|---|---|
| Base rent with adjustments based on increases in CPI only | Slightly higher base rent with adjustments based on increases in CPI *plus* an amount equal to the fair market value rent of Private Sky's |

| | |
|---|---|
| | improvements built as of 2018, which begins in part in 2035 and in full in 2038, resulting in several million dollars in higher rent than Signature's rent over the life of the lease |
| Competing FBO permitted to locate fuel farm directly on demised premises | Private Sky required to locate fuel farm miles away from demised premises, requiring additional labor, time, and equipment expense for frequent daily travel to and from fuel farm, resulting in millions of dollars of additional costs to Private Sky over the lease that Signature is not required to bear |
| Required minimum initial hangar build-out of 24,000 square feet | Required minimum initial hangar build-out of 48,000 square feet |
| 26.2-acre initial parcel, including land that the competing FBO is not required to develop a/k/a "land banking" for future development | 13.82-acre initial parcel, all of which the lease required Private Sky to develop – no "land banking" for future development permitted |
| Parcel includes land that is already on grade and has been partially developed by the Port Authority, which the competing FBO will use for aircraft parking and to build ramp, saving millions on fill costs that were required of Private Sky | Private Sky required to fill land |
| Two 10-year extensions at <u>no additional cost</u> | One 5-year extension at no additional cost, followed by extensions conditioned on paying <u>more than $5 million dollars</u> of investment into improvements |
| Exclusive right to engage in eVTOL-related aviation activity | Port Authority informed Private Sky it is prohibited by its Lease from engaging in eVTOL-related aviation activity |
| 30-year initial term | 27-year initial term; 3-year shorter period to spread capital expenditures |

49.    For example, Private Sky is currently required to pay a base rental rate of $0.573 per square foot pursuant to the Lease. By contrast, the rental rate under the Signature Lease is $0.57 per square foot. As a result of this difference, Private Sky will be required to pay more base rent over the term of the lease.

50.    But that is not the only rental charge in Private Sky's Lease. Beginning in 2035, Private Sky will pay an additional "initial reversion rent" in the amount of $6,916.67 per month. Beginning in 2038, that reversion rent will increase based on the "Fair Market Value Rent" of certain capital improvements that Private Sky has made to its leased parcel. The Signature Lease contains no such additional rent during its initial term or any of the extensions.

51.    Private Sky's Lease also requires it to build a total of 48,000 square feet of hangar space as part of its initial buildout. The Signature Lease imposes an obligation to build only 24,000 square feet, significantly lowering the initial investment the competing FBO is required to make into its business at RSW.

52.    Private Sky's Lease further requires it to locate its fuel farm miles away from the parcel it has leased, whereas the Signature Lease permits the competing FBO to situate its fuel farm directly adjacent to its main facility.

53.    As a result of this difference in the leases, Private Sky is required to incur additional costs in labor, time, and equipment associated with transporting fuel from its fuel farm to its hangar facilities. The Signature Lease ensures that Signature will not incur those same costs.

54. In addition to the land it intends to develop immediately, Signature proposed that it be permitted to add an "unimproved lease parcel" to its leasehold "for future, demand-drive expansion purposes." Signature stated in its proposal that it wanted to develop its property in two phases: an initial phase that would include development of the land immediately necessary for its initial facilities, and a second phase that would not be developed unless and until "demand rises and there is a proven need for additional facilities."

55. That proposal was contrary to the terms of the RFP, which required that proposals seeking to lease more than the minimum 10 acres demonstrate a reasonable need for, and immediate need to use, the additional land for development of initial facilities. In accordance with the Port Authority's policy against land banking, Private Sky was never given the opportunity to lease additional land that it did not intend to immediately develop. To the contrary, the Lease explicitly provides that Private Sky must develop, use, and maintain the entirety of the leased property for use in its business as an FBO.

56. Despite those requirements, the Signature Lease is for a parcel that is roughly twice the size of the initial parcel leased to Private Sky, while requiring Signature to build only half the hangar space required of Private Sky.

57. The Signature Lease includes, as Exhibit "A," a diagram of proposed hangar development showing that Signature does not intend to use all of the leased parcel immediately and instead intends to focus its initial buildout on areas that have already been partially improved by the Port Authority.

58.     Thus, the Signature Lease permits Signature to lease land without a requirement to immediately develop and use that land. In practical effect, Signature is permitted to reserve land for future competition and expansion, preventing Private Sky or another competitor from obtaining the use of that land if demand later rises and additional facilities are needed.

59.     The Port Authority has permitted Signature to land bank without paying the costs of developing the land, while refusing Private Sky that same advantage. If Private Sky had been permitted to do so, it would have banked the land now being leased to the competing FBO.

60.     As further alleged above, Signature also requested and obtained modifications to the parcels it proposed to lease, despite the clear requirements that proposers take at a minimum the entirety of the 10 acres identified as Parcel A in the RFP.

61.     In particular, Signature requested that a retention basin be removed from Parcel A because it did not want to pay the cost of filling that basin.

62.     Signature instead asked either to be permitted to construct a taxiway connector through another company's leasehold at RSW, or for the Port Authority to shoulder some of the cost of developing the 10 acres so that Signature could use it, even though the RFP made clear that the land had to be developed at the proposer's sole cost and expense.

63.     Ultimately, the Port Authority and Signature appear to have resolved that issue in the lease by simply ignoring the clearly stated requirements in the RFP

and entering into a lease for a new parcel that does not include any portion of Parcel A.

64. By contrast, the Signature Lease allows Signature to obtain a lease of a parcel of its choosing rather than being required to lease the specific 10-acre Parcel A identified in the RFP, while also permitting it to lease the remaining property without being required to make the substantial investment necessary to develop that land.

65. When Private Sky initially negotiated the Lease, it requested a 50-year lease, which would help it spread its initial investment over a longer period and help ensure it could recoup that investment. The Port Authority informed Private Sky that it would not permit a lease longer than 27 years with a 5-year renewal option. As a result, Private Sky obtained an initial term of between 25 and 27 years in the Lease, with one 5-year renewal option.

66. In 2018, Private Sky obtained two options for additional extensions to its Lease, but those options came at significant cost. In order to obtain the 50-year lease term it originally sought, Private Sky was required to commit to an additional $3.6 million in capital improvements to its leased parcel, all of which would revert back to the Port Authority upon termination of the Lease.

67. But when the Port Authority issued the RFP, it did so on terms different from those it had insisted on in the Lease with Private Sky. In fact, the 27-year term required in Private Sky's Lease would not have even been permitted in the competing FBO's proposal, because the RFP provided that the proposed lease term had to be at least 30 years and could be as long as 50 years.

68. Signature proposed a 50-year term, and the Port Authority ultimately agreed to the Signature Lease, which includes a 30-year term with two 10-year extensions. The Port Authority did not require Signature to absorb the risk of a maximum 32-year term and then wait 18 years to negotiate a possible extension conditioned on its investment an additional $3.6 million to obtain a 50-year term, even though it had required Private Sky to accept those risks and make that investment in order to achieve the same result.

69. Finally, the Signature Lease grants the competing FBO the opportunity to make and pursue enhancements for electric vertical takeoff and landing ("eVTOL"), an opportunity that Private Sky has specifically been denied.

70. This difference between the two leases is particularly significant because the prohibition against eVTOL development prevents Private Sky from expanding its business to meet the needs of potential future customers, while the Signature Lease permits Signature to pursue that opportunity.

71. These are not the only advantages granted to Signature, but they are among the most significant. Taken together, the Signature Lease grants Signature material operational, financial, developmental, and competitive advantages that the Port Authority continues to deny to Private Sky.

**Resulting Harm to Private Sky**

72. As a result of the Port Authority's conduct, Private Sky has suffered and will continue to suffer substantial harm.

73.     The Port Authority's actions have resulted in Signature obtaining a lease that will permit it to operate on materially more favorable commercial terms than Private Sky, subjecting Private Sky to higher rates, fees, and obligations while permitting its direct competitor to operate under less burdensome conditions.

74.     Private Sky has invested millions of dollars into its facilities, operations, and leasehold at RSW in reliance on the terms of its Lease and on the expectation that the Port Authority would not exercise its contractual discretion in a manner that unfairly destroyed or substantially undermined the value of Private Sky's bargain.

75.     By refusing Parcel X to Private Sky, then ultimately awarding a lease for that parcel to Signature through a materially changed and nonpublic process, the Port Authority placed Private Sky at a substantial and ongoing competitive disadvantage without affording Private Sky – or any other potential FBO, for that matter – a reasonable opportunity to obtain the same favorable lease terms, including the right to lease Parcel X.

76.     As a result of the materially different terms granted to Signature, Private Sky is forced to compete against a direct competitor with lower costs, greater operational flexibility, and access to additional undeveloped land, placing Private Sky at a substantial and ongoing disadvantage due to the Port Authority's actions.

77.     These disparities will persist for the duration of the respective lease terms, impairing Private Sky's ability to compete, expand, and maintain its business at RSW, and substantially frustrating the benefit of Private Sky's Lease.

78.     Absent relief, Private Sky faces the complete loss of its business, including its employees, goodwill, customer relationships, and reputation – harm that cannot be adequately remedied by monetary damages alone.

### The Port Authority's conduct was in bad faith

79.     The foregoing conduct is all the more egregious given that, on information and belief, the Port Authority, in the process of negotiating the Signature Lease that violates these competitive procurement mandates, also violated the Sunshine Law so that its actions were, at least initially, concealed from the public and Private Sky.

80.     After the Board's ranking of proposers was approved, the Port Authority Procurement Manual directed staff to commence negotiations with the proposers in accordance with the approved ranking. The Port Authority Procurement Manual further provided that "[i]f staff is unable to negotiate such an agreement, staff will formally terminate negotiations with the highest ranked firm in writing and open negotiations with the next highest ranked firm." *See* Port Authority Procurement Manual at 36.

81.     The Port Authority did not follow its own procedures, instead failing to terminate the negotiations when Signature would not agree to a lease that comported with the one offered for competitive bidding by the RFP. The Port Authority chose a back-room deal that it hid from Private Sky that favored Signature over Private Sky ad gave Signature a competitive advantage. Internal correspondence at the Port Authority

reveals that the Port Authority knew it was giving Signature an advantage. Signature's advantage was the point all along.

**The Port Authority now seeks to leave Private Sky without a remedy.**

82.    Private Sky initially brought its claims for relief on the grounds set forth in Counts II and III, below, in an action in the Florida state courts in Lee County, Florida.

83.    However, in *PrivateSky Aviation Realty, LLC v. Lee County Port Authority*, Lee County Clerk Case No. 26-CA-001673, the Port Authority sought and obtained a dismissal of Private Sky's claims in that action on the basis that the Florida state courts lacked subject-matter jurisdiction over the claims in that case.

84.    In that case, the Port Authority asserted that to resolve Private Sky's claims that its Lease had been breached, the state court must interpret and apply the laws of the United States as pronounced by Congress at 49 U.S.C. § 47107 and implemented by the FAA through its Grant Assurances, which deprives the state court of jurisdiction.

85.    Because the state court dismissed that case for lack of subject-matter jurisdiction at the request of the Port Authority, any ruling by that court that purports to affect the merits of those claims in any way or to preclude Private Sky from seeking a ruling on the merits of those claims elsewhere is null and void.

86.    All conditions precedent to the maintenance of this action have occurred, have been performed, or have been waived.

## COUNT I
### *Declaratory Judgment – 28 U.S.C. § 2201,* **et seq.**

87.　Private Sky readopts and realleges paragraphs 1 through 86 above as if fully set forth herein.

88.　As set forth above, the Port Authority has sought and obtained an order from a state court holding that that court lacked subject-matter jurisdiction to hear a breach of contract action arising from certain independent terms of the Lease between Private Sky and the Port Authority that incorporated the assurances Congress and the FAA required the Port Authority to make pursuant to 49 U.S.C. § 47107 and the FAA Grant Assurances.

89.　Private Sky seeks a declaration from this Court as to the following questions:

> (1) In 49 U.S.C. § 47107, did Congress strip federal courts of jurisdiction to hear breach of contract actions when the FAA Grant Assurances have been incorporated into a contract between an airport operator and a third party?
>
> (2) Did the FAA strip federal courts of jurisdiction to hear such breach of contract actions by promulgating procedural rules governing administrative proceedings brought by the general public to complain about failure to meet assurances made to the FAA, as provided in 14 C.F.R. § 16.1, *et seq.*?
>
> (3) If the FAA has purported to strip federal courts of subject matter jurisdiction to hear breach of contract claims in 14 C.F.R. § 16.1, *et seq.*, was that action constitutional?
>
> (4) Does the FAA have constitutional or statutory authority to hear Private Sky's breach of contract claims against

> the Port Authority and award Private Sky damages and/or injunctive relief?
>
> (5) If there is no venue for enforcement of the economic-nondiscrimination provision of the Lease, is the Port Authority estopped from asserting that the economic-nondiscrimination provision of the Lease is unenforceable by accepting millions of dollars in investment in RSW by Private Sky made in reliance on the enforceability of the provisions of the Lease?

90. As set forth herein, there is an actual and substantial controversy between Private Sky and the Port Authority as to whether Congress or the FAA intended to strip courts of jurisdiction to hear breach of contract actions such as those set forth in Counts II and III, below.

91. Private Sky and the Port Authority have adverse legal interests with respect to this question. If Private Sky is correct, then it is entitled to enforce terms of its the Lease with the Port Authority in a court of law. If the Port Authority is correct, Private Sky would be left without a venue to pursue claims for breach of terms incorporated into its Lease, making those terms unenforceable and illusory.

92. That controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. Without a declaration from this Court as to whether courts lack jurisdiction to hear claims for breach of terms of a contract that were incorporated into that contract by reference to Grant Assurances mandated by Congress or the FAA, Private Sky will be required to proceed with its efforts to obtain relief from the Port Authority's breach of those contractual provisions under substantial uncertainty as to the proper venue in which to bring those claims.

WHEREFORE Private Sky respectfully requests this Court enter a declaratory judgment pursuant to 28 U.S.C. § 2201, *et seq.*, and providing:

A. that Congress did not strip federal courts of jurisdiction to hear breach of contract actions asserting violations of terms of Grant Assurances incorporated into a contract pursuant to 49 U.S.C. § 47107;

B. that the FAA did not strip federal courts of jurisdiction to hear breach of contract actions asserting violations of terms of Grant Assurances incorporated into a contract pursuant to 49 U.S.C. § 47107; or, in the alternative

C. that if the FAA stripped federal courts of jurisdiction to hear such actions, that that action was unconstitutional as applied;

D. the FAA does not have jurisdiction to adjudicate Private Sky's breach of contract claims; and

E. If there is no venue for enforcement of the economic-nondiscrimination provision of the Lease, the Port Authority is estopped from asserting that the economic-nondiscrimination provision of the Lease is unenforceable by accepting millions of dollars in investment in RSW by Private Sky made in reliance on the enforceability of the provisions of the Lease.

F. providing such other necessary and proper relief based on that declaratory judgment as permitted by 28 U.S.C. § 2202,; and

G. providing such other relief as this Court deems just and proper.

## COUNT II
### *Breach of Contract – Lease Section 22.3*

93.     Private Sky readopts and realleges paragraphs 1 through 86 above as if fully set forth herein.

94.     The Lease between Private Sky and the Port Authority is an enforceable contract.

95.     Section 22.3 of the Lease states:

> Subordination. This agreement **is subject** and subordinate to the provisions of any governmental restrictions of record and any existing or future agreement entered into between the Authority or Lee County and the United States, for the improvement or operation and maintenance of the Airport, the execution of which has been or may be required as a condition precedent to the transfer of federal rights or property to Authority for Airport purposes, or the expenditure of federal funds for the improvements or development of the Airport.

96.     Pursuant to 49 U.S.C. § 47107 and the FAA Grant Assurances, Congress and the FAA have required the Port Authority to provide it with certain assurances, including assurances that the Port Authority will only lease airport property to other FBOs on the same economic terms required of Private Sky, and that it will not provide any exclusive right to any FBO operating at RSW (the "Assurances").

97.     Section 22.3 of the Lease, which is contained in the "FAA Clauses" section of the Lease, operates to incorporate those Assurances by reference as independent terms of the Lease.

98.     In relevant part, Assurance No. 22(c) states:

> (c) Each fixed-based operator at the airport shall be subject to the **same rates, fees, rentals, and other charges** as are

> uniformly applicable to all other fixed-based operators making the same or similar uses of such airport and utilizing the same or similar facilities.

(emphasis added).

99. Under the terms of the Signature Lease, Signature would make the same or similar use of the airport to provide FBO services at RSW and would utilize the same or similar facilities at that airport.

100. But Private Sky's Lease imposes substantially higher rates, fees, rentals, and other costs upon Private Sky over the full term of its lease than Signature will be obligated to pay under the Signature Lease.

101. In the alternative, to the extent that Signature's use or facilities would differ from Private Sky's, the Signature Lease offers Signature several substantial advantages over Private Sky which cannot justify requiring Signature to pay less than Private Sky for a more advantageous lease.

102. As a direct result of the Port Authority's breaches of the Lease, Private Sky has been damaged.

103. There is no adequate remedy at law for the injury suffered by Private Sky as a result of the Port Authority's approval of the Signature Lease on terms that are unjustly economically discriminatory as to Private Sky. Once dead, the law cannot resurrect Private Sky. Its employees, the lifeblood of the business, will have moved on to other jobs. Its goodwill, reputation, and customer and vendor awareness will have disappeared or been harmed beyond repair.

104.    In the absence of injunctive relief preventing the Port Authority from leasing airport property to the competing FBO on terms that are unjustly economically discriminatory as to Private Sky, Private Sky will suffer irreparable harm; specifically: Private Sky will be forced to pay rates, fees, rentals, and other charges that are substantially higher than those charged to the competing FBO; such unfair competition will cause Private Sky to cease to exist.

105.    An injunction to prevent the Port Authority from continuing to provide Signature favorable treatment under the Signature Lease is in the public interest, as it is in the public interest to prevent economic discrimination and unfair competition using public property and public funds.

106.    In the alternative, in the event it is determined that injunctive relief is not available for whatever reason or if an injunction is entered after some amount of quantifiable damages have already been incurred, Private Sky seeks an award of damages against the Port Authority for breach of the Lease, as alleged herein.

WHEREFORE Plaintiff PrivateSky Aviation Realty LLC requests that the Court enter a permanent injunction preventing the Port Authority from leasing airport property to a competing FBO on terms that permit unfair competition or that violate the economic nondiscrimination and non-exclusivity assurances incorporated into the Lease, and/or an award of damages as requested herein, and providing such other relief as it may deem just and proper.

### COUNT III
*Breach of the Implied Duty of Good Faith
and Fair Dealing – Lease Section 21.10*

107. Private Sky realleges paragraphs 1-2, 4, 6-11, 13-37, and 39-86 above as if fully set out herein.

108. The Lease between Private Sky and the Port Authority is a valid and enforceable contract.

109. The Lease grants the Port Authority certain contractual discretion with respect to airport development and the introduction of other operators at RSW.

110. Specifically, section 21.10 of the Lease provides:

> Airport development. Authority reserves the right to further develop, change, or improve the airport and its routes and landing areas as Authority sees fit, without Lessee's interference or hindrance and regardless of Lessee's views and desires.

111. Under Florida law, where a contract grants one party discretion in performance, that discretion is constrained by an implied obligation to exercise that discretion in good faith and not in a manner that unfairly frustrates the other party's reasonable contractual expectations.

112. Private Sky invested millions of dollars into airport property and made long-term business commitments in reliance on the Lease and on the understanding that the Port Authority would not exercise its contractual discretion in a manner that destroyed or substantially undermined Private Sky's ability to enjoy the rights and privileges it had negotiated for in its Lease.

113. The Port Authority breached the implied covenant of good faith and fair dealing by exercising its contractual discretion over airport development, competition, leasing, and procurement in bad faith and in a manner designed to disadvantage Private Sky and favor Signature.

114. Under Florida's competitive procurement statutes, if the Port Authority wanted to solicit proposals for a lease for a new FBO at RSW, it was required to do so in a manner that was open to the public and that afforded all interested bidders the opportunity to submit a proposal subject to the same rules and conditions that were applicable to all other interested bidders.

115. The Port Authority had previously learned that Parcel X had substantial value as a location for an FBO business when Private Sky sought to lease Parcel X from the Port Authority.

116. Later, the Port Authority initiated a purportedly "public" procurement for an additional FBO for Parcels A and B, excluded Private Sky from bidding, and then, after negotiations began, materially altered the publicly-advertised transaction without notifying the public that it had made those changes.

117. The Port Authority thereafter awarded Signature a materially different and more favorable lease which included Parcel X: the same parcel the Port Authority had previously refused to lease to Private Sky.

118. But the Port Authority's own statements to the public in connection with its RFP made clear that any proposal was *required* to be made on the terms in the RFP.

119.    In other words, after repeatedly telling all potential bidders that they must seek to lease all of Parcel A, may lease some of Parcel B, and that Parcel X was not up for proposal, the Port Authority reversed course and allowed Signature to obtain a lease that did not include *any* of Parcel A, only some of Parcel B, and all of Parcel X.

120.    Worse, the Port Authority negotiated and approved that materially-changed deal through meetings and decision-making processes that were not publicly noticed or open to the public and were not conducted in compliance with Florida's Sunshine Law requirements.

121.    Neither Private Sky nor any other potential bidder were ever even made aware of the undisclosed changes to the material terms of the RFP – that the Port Authority made outside the public eye – until the Signature Lease was publicly released, and no other entity was afforded an opportunity to make a proposal to compete with Signature's for the terms that were eventually executed in the Signature Lease.

122.    The Port Authority further exercised its discretion in a manner that materially favored Signature by allowing Signature to change the terms of the lease to terms that were substantially more advantageous than those imposed on Private Sky, including more favorable rent treatment, reduced initial buildout obligations, more favorable fuel-farm placement, land-banking rights, more favorable extension rights, and eVTOL-related opportunities denied to Private Sky. But Private Sky was never afforded the opportunity to bid for a lease that included those advantageous terms

because the Port Authority's negotiations with Signature took place in secret outside the public eye.

123.   The Port Authority's discretion under section 21.10 of its Lease with Private Sky permitted the Port Authority to further develop the airport and to grant privileges to another lessee that are similar to those granted to Private Sky. It did not permit the Port Authority to carry out that process through a back-room, no-bid, materially-altered transaction that granted disproportionately favorable terms to Private Sky's direct competitor in a manner that substantially impaired Private Sky's profitability, goodwill, and ability to continue operating its business at RSW.

124.   By renegotiating the terms of its lease with Signature in secret without notice to the public, the Port Authority exercised its discretion arbitrarily, unfairly, and in bad faith, depriving Private Sky of the benefit of its bargain under the Lease.

125.   The fact that the Port Authority is willing to skirt its obligations under Florida's Sunshine Laws, the competitive procurement statutes, and the Port Authority's own procurement guidelines in order to secure a sweetheart deal for its preferred FBO service provider is evidence that it exercised its discretion to further develop RSW in bad faith.

126.   As a direct and proximate result of the Port Authority's breach of the implied covenant of good faith and fair dealing, Private Sky has suffered damages and will continue to suffer substantial and irreparable harm.

WHEREFORE Private Sky requests this Court enter judgment against the Port Authority for breach of its implied duty of good faith and fair dealing as to section

21.10 of the Lease, awarding Private Sky its damages associated from that breach, awarding Private Sky its reasonable attorneys' fees and costs associated with the maintenance of this suit, and providing such other relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a jury trial on all issues and claims so triable.

Dated: August 10, 2026

Respectfully submitted,

/s/ Paul Thanasides
Paul Thanasides
Florida Bar No. 103039
paul@mcintyrefirm.com
clservice@mcintyrefirm.com
Garrett Severson
Florida Bar No. 108259
garrett@mcintyrefirm.com
complexlit@mcintyrefirm.com
Hillary Thornton
Florida Bar No. 1018229
hthornton@mcintyrefirm.com
McIntyre Thanasides Bringgold
    Elliott & Grimaldi, P.A.
1228 E 7th Avenue, Suite 100
Tampa, FL 33605
Telephone: 813.223.0000
Facsimile: 813.225.1221
*Counsel for PrivateSky Aviation Realty LLC*